### THE TRITON.

### THE JOHN A. CURTIS.

#### (Circuit Court of Appeals, Fourth Circuit. November 6, 1902.)

#### No. 441.

1. COLLISION—VESSELS CROSSING—STEAM TUG AND SCHOONER.

Conflicting evidence examined, and a tug *held* solely in fault for a collision in Hampton Roads in the night, with a schooner, on a crossing course.

2. SAME—NAVIGATION RULES.

Article 28 of the general navigation rules, which provides that, "when vessels are in sight of each other, a steam vessel under way, whose engines are going at full speed astern, shall indicate that fact by three short blasts on the whistle," is applicable, and obligatory, although the other is a sailing vessel.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk.

This is a case of collision between a steam tug and a schooner in Hampton Roads in that part that lies between the Ripraps and the wharf at Old Point Comfort. The collision happened at 9 o'clock in the evening. The night was clear, the wind blowing from the north and west. The collision occurred October 16, 1900. The libel on behalf of the schooner was filed October 19, 1900. The depositions of the three seamen on the schooner were taken October 22, 1900. The answer of the steam tug was filed December 20, 1900. The case was heard before the district judge May 8, 1901, when the master of the schooner testified in court, together with all the witnesses for the tug. The libel on behalf of the schooner states: That she was of 147 tons, with a cargo of 183 tons of fish scrap, bound from Fairport, Va., to Norfolk, with a crew consisting of a master and three colored men. The schooner was on a course about southwest by west through the Roads, well over to the O. Point Light side, making for the Norfolk Channel. The schooner's booms were on her port side, and the wind was blowing strong from the north and west. That the tug was seen by the master of the schooner anchoring her tow in the vicinity of the Ripraps, and afterwards was observed, without her

---

¶ 2. Collision rules, see notes to The Niagara, 28 C. C. A. 532; The Mount Hope, 29 C. C. A. 368.

towing light, heading apparently in the direction of Old Point wharf, showing her green and white lights. That the schooner was kept on her course until the vessels were very close together, the tug heading directly across the bows of the schooner. That the master of the schooner, seeing that a collision was inevitable, tried to ease the blow by starboarding his wheel, but only succeeded in getting it partly over, changing his course less than a point, when the boom and bowsprit of the schooner struck the tug aft of the smokestack. The tug passed by, but the schooner was seriously injured, and it was necessary to beach her. That from the time the tug was seen to start towards Old Point wharf she appeared to be going at her ordinary full speed, and so continued, and blew one short whistle about the time of the collision. The case for the tug, stated in her answer, is that she is a large, powerful seagoing tug, engaged in seatowing along the Atlantic coast. That she had just come in from the sea, towing the barge Knickerbocker, and had anchored the barge about one mile westwardly from the Ripraps, and, after taking in her hawser, proceeded under one bell for Old Point wharf, to get orders. While so proceeding, at a slow speed, the red light of a schooner was observed almost half a mile distant off her starboard bow, apparently on a southwest course. The tug's wheel was then put to port, and her engines stopped, in order to give the schooner ample room to keep her course in safety; but when the schooner was about a quarter of a mile distant, sailing rapidly under the strong wind from the northwest, she was seen to change her course, and keep off, so as to head for the tug, finally shutting in her red light. The tug promptly put her engines full speed astern on observing the schooner's change of course, but, although the tug succeeded in getting sternway on, it was to no purpose, and the schooner came on at a rapid speed, striking the tug on the starboard side, carrying away a portion of the tug's after-house.

Floyd Hughes, for appellant.

H. H. Little (Robert M. Hughes, on brief), for appellee.

Before SIMONTON, Circuit Judge, and MORRIS and BRAWLEY, District Judges.

MORRIS, District Judge (after stating the facts). There are conflicts in the testimony which we have not been able to reconcile, and, after careful consideration, we can but agree with the district judge who heard the case that the libelant's account of the movements which resulted in the collision is far the more reasonable and probable. The schooner's crew were not intelligent men, but seem to have had this virtue: that they did not attempt to testify to anything more than they actually saw and knew. Their testimony was taken only six days after the collision, and they obviously had not time to work up any theory of how the collision occurred, and to shape their testimony to support it. The wheelman is positive that the schooner's helm was not changed until the master ordered it hard up just before the collision; and he states that the collision came so quick that the schooner's course was not in fact changed. The schooner had a straight course, with a fair wind up the Roads past the Old Point wharf, and there was no reason why she should change. If they had mistaken the green light of the tug which they saw for the green light of a sailing vessel on their port bow, as has been suggested, the schooner's duty would have been just the same,—to keep her course. The tug's witnesses state (a fact not stated in her answer): That she was lying off in the channel between the Ripraps and the Old Point wharf for half an hour waiting for a steamer at the wharf to leave it. That they lay

about a mile from the wharf, heading about N. W. by N., directly for it. That when they saw the steamer leaving the wharf they started ahead under one bell, and in about a minute and a half the schooner's red light was reported about four points on the tug's starboard bow, about half a mile away. That the tug's engines were then stopped, and her wheel put to port, so as to pass under the schooner's stern. That when the schooner was about a quarter of a mile away those on the tug saw her swinging to port. This they say they made out by the appearance of the hull and sails, and not by a change of lights, for, although they had lost the schooner's red light, they never saw her green light. That, when they saw the schooner swinging to port, the tug's engines were reversed full speed astern, and the tug got under sternway; and that the collision happened very shortly after the schooner's red light was shut in. Christensen, a deck hand on the tug, who was standing abreast of the forward rigging, testifies that the tug's engines were reversed before the schooner was observed to change her course, and continued to go astern until the collision.

It is difficult to believe, against the positive testimony from the schooner, that her green light was not burning; and if it (her green light) was burning, and not seen from the tug, it is quite convincing proof that the schooner did not change her course, for, if she had done so at any distance from the tug, she would have exhibited her green light. It is also difficult of comprehension why, if the experienced master of this powerful tug saw the schooner nearly abeam changing her course towards his stern at a quarter of a mile off, he did not put his engines full speed ahead instead of astern. These difficulties and others are all explained, and the conflicts in the testimony disappear, if it be true that the tug's engines were stopped because she was waiting for a clear berth at the wharf, and not on account of the approaching schooner; and that the master of the tug was watching what was going on at the wharf directly ahead of him, and, confused by the lights of the steamer lying at the wharf and the electric lights at the wharf and the hotels, he did not observe the schooner until she was close upon him, sailing rapidly, and then reversed his engines as the best thing to do in the emergency. For 20 minutes before the tug started across the channel for the Old Point wharf, her witnesses say there was no one in the pilot house, both the master and the mate being aft on the tug superintending the taking in of a 200-fathom hawser, while the tug was drifting. When they went into the pilot house, they started for the wharf, and then they stopped the engines for half an hour while they watched the wharf for an opportunity to make a landing. It does not seem, therefore, improbable, that they neglected to continue to watch the red light of the schooner, and that the tug's engines were not stopped on her account; but that when she was close upon them, coming on at eight miles an hour, and her sails began to be visible, they erroneously supposed that her sails indicated a change of course. It has been frequently observed that as the sails of an approaching vessel are coming into view at night, they are liable to present the appearance of changing without really doing so. The witnesses from the tug testified in court about eight months after the

occurrence, when their opinions as to minute intervals of time and distance must have been in the nature of guesses.

It was suggested in argument that the tug could in no case be held in fault for not blowing a signal, as under no circumstances was such a signal required to be given to a sailing vessel. Article 28 of the act of June 7, 1897 [U. S. Comp. St. 1901, p. 2884], provides: "Art. 28. When vessels are in sight of one another, a steam vessel under way, whose engines are going at full speed astern, shall indicate that fact by three short blasts on the whistle." This article made it obligatory upon the tug, when she put her engines full speed astern, to give warning of that fact by three short blasts. Under the facts of the case as we find them, this omission was not, perhaps, of special consequence, but, if the vessels had been as far apart as contended on behalf of the tug, it would have been a very important warning to the schooner, as her master says he heard the jingle bell on the tug, which was rung for full speed astern, and he supposed it meant full speed ahead. The single blast heard by those on the schooner was probably from the steamer just leaving Old Point wharf.

Upon careful consideration of the testimony, although some of it is confusing, we see no reason to differ with the conclusion of the district court, and the decree is affirmed.